UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DARELL LAVAL,** | Civ. No. 2:10-04416 (KM)(MAH) |
| **Plaintiff,** | |
| v. | **OPINION** |
| **JERSEY CITY HOUSING AUTHORITY et al.,** | |
| **Defendants.** | |

**MCNULTY, U.S.D.J.:**

This matter comes before the Court upon the motion for summary judgment of the Defendants, Jersey City Housing Authority, Maria T. Maio, and Grace M. Malley. Because I find that there is no material issue of fact remaining in the case, I enter summary judgment in favor of the Defendants.

I.   **BACKGROUND**

Plaintiff, Darrell Laval, originally brought this action against the Defendants for claims related to his termination by the Housing Authority of Jersey City, formerly known as the Jersey City Housing Authority ("JCHA").[1] The employment-related claims were dismissed by the judge formerly assigned to this case. I here consider the remaining claim, which relates to a search of a JCHA unit used by Laval during his employment. Plaintiff claims that the search was illegal under the Fourth Amendment.

For the purposes of this motion, I consider the Defendants' Joint Statement of Undisputed Material Facts ("JSUMF") and the Plaintiff's Responsive Statement of Material Facts ("RSMF") pursuant to L. R. Civ. P. 56.1 (Docket Nos. 47-2, 49-1), as well as the deposition testimony and documentary evidence. Facts not contested are assumed to be true.

---

1   For simplicity, I will use the abbreviation "JCHA" throughout.

1

### A. Procedural History

Plaintiff initiated this action by filing a Complaint in the Superior Court of New Jersey, Case no. HUD-L-4452-10. Defendants removed the action to this district court on August 27, 2010. (Docket No. 1). The case was originally assigned to Hon. Susan D. Wigenton. At the time of removal, the Complaint included claims for race discrimination pursuant to the New Jersey Constitution and Title VII of the Civil Rights Act, interference with freedom of speech in violation of the First Amendment, intentional infliction of emotional distress, violation of equal protection under the New Jersey Constitution and 42 U.S.C. § 1983, violation of the Fair Labor Standards Act, 29 U.S.C. § 201, and illegal search and seizure under the Fourth Amendment in violation of 42 U.S.C. § 1983. Compl. ¶¶ 31-109.

On May 10, 2011, Judge Wigenton dismissed eight of the nine counts in the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), leaving only the Fourth Amendment claim. (Docket Nos. 17-18). Plaintiff's motion to amend the Complaint was also denied. *Id.* Discovery closed on April 2, 2012 (Docket No. 26), with one additional deposition permitted on May 18, 2012 (Docket No. 33). The case was reassigned to me on September 24, 2012. (Docket No. 45).

### B. Facts of the Case
#### 1. Plaintiff's Employment with the JCHA

Laval was employed by the JCHA for approximately 23 years. Laval Decl., Opp. Exh. J (Docket No. 49-11) ¶ 2. From December 2006 until October 2009, he was a Regional Asset Manager for the JCHA. JSUMF ¶ 9; RSMF ¶ 13; Laval Dep., Def. Br. Exh. 3 (Docket No. 47-4) at 15. As Regional Asset Manager, Laval had responsibility for oversight and management of several JCHA housing complexes, including Berry Gardens, located at 72-82 Danforth Avenue in Jersey City. JSUMF ¶ 12; Laval Dep. at 17. Laval supervised the "Asset Managers" (*i.e.*, property managers) for these sites, visited the sites, and reported on their fiscal and occupancy status. *Id.*; Laval Dep. at 16, 21; Maio Dep., Def. Br. Exh. 5 (Docket No. 47-5) at 124-25.

From December 2006 to the present, Defendant Maio has been the Executive Director of the JCHA. JSUMF ¶ 10. In that position, Maio was Laval's direct supervisor. *Id.* Defendant Malley is the Director of Human Resources for the JCHA and Laval also reported to her. *Id.* ¶ 11. The Asset Manager for Berry

2

Gardens during the relevant period was Stephanie Carson. Laval Dep. at 19. Carson directly reported to Laval when he was the Regional Asset Manager. Laval Dep. at 20. The maintenance supervisor for Berry Gardens during the relevant period was Guy Kohler. Laval Dep. at 23.

Regional Asset Managers generally do not live in JCHA housing complexes. JSUMF ¶ 13; Laval Appointment Letter, Def. Br. Exh. 1 (Docket No. 47-4); Kohler Dep., Def. Br. Exh. 6 (Docket No. 47-5) at 9, 13. Typically, each JCHA building has one or two "On-site Persons" who are required to live there, usually on an upper floor of the building. JSUMF ¶¶ 57, 63-64; Kohler Dep. at 38. The On-site position and the Regional Asset Manager position are distinct jobs within the JCHA. Id. ¶ 56.[2]

There is no documentation showing that Laval was an On-site Person for the JCHA at any time. Id. ¶¶ 58-60; Laval Dep. at 137; Maio Dep. at 50; Kohler Dep. at 11, 19. Defendants assert that On-site Persons are required by the JCHA to sign an "On-site Person Agreement." JSUMF ¶ 61; Maio Dep. at 53. Laval never signed such an agreement, nor did he receive payment for this position. Id. ¶¶ 62, 66. He maintains, however, that he held the position of On-site Person pursuant to an unwritten agreement. Id. ¶ 75; Laval Dep. at 137; RSMF ¶¶ 59, 61. Laval asserts that, in lieu of salary or payment for his service as an On-site Person, he was given the use of an apartment in one of the housing complexes he managed. RSMF ¶¶ 66, 68.

All JCHA employees are subject to the JCHA Rules and Regulations, including the JCHA Code of Ethics Policy for Employees (hereinafter the "Code"). JSUMF ¶ 105. The Code provides that JCHA property is to be used only for JCHA business unless alternative arrangements, including reimbursement for personal use, are agreed to by the employee and the JCHA. Id.; Code, Def. Br. Exh. 19 (Docket No. 47-8) at III(D). Plaintiff does not dispute the existence of this policy but argues that the rules are selectively enforced. RSMF ¶ 105.

### 2. Plaintiff's Residency

Plaintiff's residency is disputed. Laval's family home address, which has been reported on numerous forms and personnel records, is 140 Wade Street

---

[2]   Plaintiff disputes this fact, but only on the basis that he was "obviously treated differently." RSMF ¶ 56.

3

in Jersey City. He argues, however, that he maintained a second residence at Unit 104 in Berry Gardens, at 72 Danforth Avenue. The Fourth Amendment claim concerns a search by Defendants of Unit 104 while Laval was on an extended leave of absence.

Unit 104 is located on the ground floor of the Berry Gardens complex. JSUMF ¶ 41. In the 1990s, the U.S. Department of Housing and Urban Development ("HUD") decommissioned all ground floor units at 72 Danforth Avenue, including Unit 104, in effect converting them from residences to non-residences. *Id.*; Maio Dep. at 53; Kohler Dep. at 54-55. Because of this decommissioning, the JCHA cannot place any residents in those ground floor apartments without pre-approval from HUD. *Id.* ¶ 44. Setting aside Unit 104, all other ground floor apartments at 72 Danforth Avenue were used for office space or storage. *Id.* ¶ 46; Kohler Dep. at 30-31. Unit 104 is not currently in use as an apartment, but was reassigned to another JCHA director as office space approximately six months after Laval's termination. JSUMF ¶ 109.

Defendants assert that Laval consistently reported his home address as 140 Wade Street, not Berry Gardens. *Id.* ¶ 16; *see also* RSMF ¶ 16. The most recent JCHA personnel record from 2008-09 year reported the Wade Street address. *Id.* ¶ 18; RSMF ¶ 17-18; Def. Br. Exh. 7 (Docket No. 47-5). Laval also reported 140 Wade Street on his May 27, 2008 application for health benefits, which also listed the Wade Street land line as his phone number. JSUMF ¶¶ 19-20; RSMF ¶¶ 19-20. He also reported that address on a health benefit open enrollment form dated December 31, 2008. *Id.* ¶ 22. Laval never reported a change of address to the JCHA. *Id.* ¶ 17.

Additionally, Laval reported 140 Wade Street as his address on commercial licenses, the last of which was issued on January 6, 2009. *Id.* ¶ 24; Def. Br. Exh. 9 (Docket No. 47-5). His driver's license never listed the Berry Gardens address. *Id.* ¶ 25; Def. Br. Exh. 3 (Docket No. 47-4). Laval reported his home address as 140 Wade Street on a candidate information sheet dated February 27, 2009, in connection with the Jersey City Fire Department's Fire Safety Manager program. *Id.* ¶ 26; Def. Br. Exh. 10 (Docket No. 47-5). Laval's resume represents his address as 140 Wade Street. *Id.* ¶ 25; Def. Br. Exh. 11 (Docket No. 47-5). In sum, apart from this lawsuit, Plaintiff never reported a JCHA unit as his home address. *Id.* ¶ 16.

At his deposition, Laval declined to establish even a general time frame for his alleged residence at Berry Gardens. Laval Dep. at 10.[3] He stated that he continued to stay "off and on" at 140 Wade Street during the same period he allegedly resided at Berry Gardens. Laval Dep. at 13. He did not answer with any specificity how much of the time he stayed at the Berry Gardens unit—he could not state, for example, whether it was daily or multiple times a week. *See* Laval Dep. at 119-120. Laval did not remember how many holidays, if any, he spent at the Berry Gardens unit. JSUMF ¶ 32; Laval Dep. at 156. He did not have a personal land line telephone number in Unit 104. *Id.* ¶ 22. He also did not receive mail at that address. Laval Dep. at 60.

Plaintiff testified that he lived alone at the Berry Gardens unit. JSUMF ¶ 50; Laval Dep. at 13. He asserts that while Unit 104 was his primary residence, he was separated from his wife. JSUMF ¶ 47; Pl. Resp. to Interrog., Def. Br. Exh. 13 (Docket No. 47-6) at #16; Laval Dep. at 12-13. During the entire period of his alleged residence at Berry Gardens, Laval's wife and children lived at 140 Wade Street. JSUMF ¶ 29; Laval Dep. at 123, 130-31. The wife and children never spent a night at Berry Gardens. JSUMF ¶ 30; Laval Dep. at 123, 130-31. Laval did not host any other guests at Berry Gardens. *Id.* ¶ 31; Laval Dep. at 156-57. He stated that he slept on a cot at the unit. RSMF ¶ 32. He also stated that he had "personal items" in the unit, including "important nonprofit paperwork." Laval Dep. at 59.

On several occasions, Berry Gardens maintenance supervisor Guy Kohler and Laval met in Unit 104 during normal business hours to discuss work-related issues. JSUMF ¶¶ 70-71. Kohler described the interior of the unit as it appeared during the meetings. In the living room, he saw a big table with three chairs, a copy machine, a desk and two book shelves; in the second room he saw filing cabinets, a desk and computers. Kohler Dep. at 29, 45-46; JSUMF ¶ 73. Kohler confirmed that none of the ground floor units at 72 Danforth Avenue were occupied; they were used for office space and storage. Kohler Dep. at 31.

Kohler was called to Berry Gardens for night emergencies on several occasions when Laval was managing the complex. He testified that on two of those occasions, Laval was present. Kohler Dep. at 36-37 (testifying that after incident was resolved, Laval left), 52-53. On five or six other occasions, Laval

---

3    When asked repeatedly to give an approximate date, or at least to narrow down the time frame, Plaintiff answered, "I try not to generalize answers." Laval Dep. at 10.

was not at the complex when Kohler responded. *Id.*; JSUMF ¶ 69; Kohler Dep. at 52.[4]

Defendants assert that Unit 104 at Berry Gardens was assigned to Laval as office space until 2007. *Id.* ¶ 38; Maio Dep. at 35-36. The JCHA provided Plaintiff with office space in his capacity as Regional Asset Manager. *Id.* ¶ 36; Laval Dep. at 81. In 2007, Plaintiff's office was officially transferred from Berry Gardens to Marion Gardens, where the JCHA's central office was located. *Id.* ¶ 39; Maio Dep. at 35-36. The address for Plaintiff's new office was 400 U.S. Highway 1. *Id.*

Laval claims that the JCHA gave him Unit 104 in or around 2007 when he became the "On-site Person" for the Berry Gardens. JSUMF ¶ 55; RSMF ¶ 55 (stating that he was given residence to respond to night calls); *id.* ¶ 58. Laval claims that his employment agreement granted him the unit to live in, in lieu of pay, to ensure his availability for handling after-hour and weekend calls and emergencies. RSMF ¶¶ 13, 76; Laval Dep. at 42.

Laval approached Defendant Maio in 2005 to express interest in becoming an On-site Person for 72 Danforth Avenue. Maio Dep. at 56-57. Maio discussed the request with the JCHA Board of Commissioners Chairman, Ed Cheatam. Maio asserts, however, that she never again discussed it with Laval or anyone else, and never took any further action regarding the request. *Id.* ¶¶ 77-78; Maio Dep. at 56-57.

Laval contends that Defendant Maio and JCHA employees Stephanie Carson and Joan Pollack all knew that he had use of an apartment at Berry Gardens. RSMF ¶ 77 (citing Pollack Dep., Def. Br. Exh. 17 (Docket No. 47-6) at 19, 22-23).[5] He asserts that Maio told the Board of Commissioners that she was making him the On-site Person. Laval Dep. at 35. Laval was not present for these conversations, but testified that he had "several conversations" with some of the Commissioners regarding their approval. *Id.* at 35-36. Laval could not recall the number of conversations he had, and could not identify the Commissioners with whom he spoke. *Id.* At any rate, the JCHA did not obtain or request pre-approval from HUD for Plaintiff's residence in Unit 104. JSUMF ¶ 44; Maio Dep. at 53. No JCHA paperwork documented Laval's alleged

---

[4]   The Record does not contain the dates of these incidents.
[5]   Pollack testified that she believed that "numerous people knew" that Laval had asked for use of the unit. Pollack Dep. at 22. She stated that she did not know whether the request had been granted. *Id.* at 23.

6

appointment as On-site Person or as a resident of Unit 104. JSUMF ¶ 52; Maio Dep. at 81.

Defendants point out that Laval could not have been formally approved for a JCHA unit. His salary made him ineligible for public housing under HUD guidelines. JSUMF ¶ 14; Maio Dep. at 53-54. Defendants also assert that On-site Persons are required to pay rent for any JCHA apartment in which they reside. *Id.* ¶¶ 67-68; Laval Dep. at 4, 61; Pl. Resp. to Interrog. at #16-17. Laval did not pay rent on the unit. Laval Dep. at 40.

Laval's deposition testimony has not been consistent regarding his alleged residency. On January 10, 2008, Plaintiff was deposed for a separate litigation[6] and testified that he had never lived in any JCHA property. JSUMF ¶ 34; Laval Dep. 95-97. At his deposition for this action, however, Laval testified that on January 10, 2008, he was living in Berry Gardens. *Id.* At 95-97. Laval explained that he was being sued in the first action, that his thinking may not have been "accurate," and that he "said that under duress." Laval Dep. at 97.

### 3. Search & Seizure

Plaintiff's claim against the Defendants is premised on a search of Unit 104 by Defendant Malley and Joan Pollack that occurred in August 2009. Laval began an extended paid leave of absence on June 29, 2009. Termination Letter, Def. Br. Exh. 20 (Docket 47-8) at 1.[7] Plaintiff alleges that during that leave of absence, Defendants illegally searched his "residence" at Unit 104 and seized personal documents. JSUMF ¶ 79, 81; Laval Dep. at 57. Laval does not recall what, if any, personal property remained in the unit at the time of the search, nor can he say when he vacated the unit. Laval Dep. at 163-67, 178. He was not at the unit at the time of the search. JSUMF ¶ 80; Laval Dep. at 75.

Defendants assert that it is customary for a JCHA employee's direct supervisor to take over his or her role during an absence. *Id.* ¶ 82. When Laval previously took an extended leave of absence, Defendant Maio filled in for him. *Id.*; August 10, 2007 email, Def. Br. Exh. 15 (Docket No. 47-6). Maio again filled in for Laval during his 2009 leave of absence, acting as the Regional Asset

---

[6] Plaintiff was deposed in *Cheryl White vs. the Housing Authority of Jersey City and Darrell Laval*. Laval Dep. at 96.
[7] Plaintiff took an approved, paid sick leave from June 29 to July 17, 2009, worked for one day on July 20, 2009, and took an approved vacation leave until September 4, 2009. Termination Letter at 1.

7

Manager for the Berry Gardens, Booker T. Washington, and Montgomery Gardens properties. *Id.* ¶ 83; July 23, 2009 email, Def. Br. Exh. 16 (Docket No. 47-6) (email from Maio informing employees in Laval's chain of command that she would be acting Regional Asset Manager and those employees' direct supervisor during his leave of absence). Defendants assert that, while covering for Laval, Maio was responsible for "handling Plaintiff's day-to-day duties, answering time-sensitive correspondence and addressing time-sensitive issues." *Id.* ¶ 84; July 23, 2009 email. Defendants further assert that in order to cover Laval's duties, Maio had to access Laval's office space and his work email account. *Id.* ¶ 85; Maio Dep. at 39.

    Maio testified that, at the time of Laval's 2009 absence, she believed that his only office was located at 400 U.S. Highway 1, and that Unit 104 in Berry Gardens was vacant. *Id.* ¶ 86; Maio Dep. at 35, 58, 61-63. Accordingly, Maio accessed Plaintiff's office space at 400 U.S. Highway 1 to check for correspondence and any other matters requiring attention. *Id.* ¶ 87. Maio discovered what Defendants describe as "time-sensitive, unanswered emails" and "outstanding [JCHA] matters requiring immediate attention," including emails regarding a bedbug extermination grant. *Id.* ¶¶ 88-89. Laval disputes that this provided a basis for searching Unit 104 and adds that it was merely a "smokescreen intended to terminate Plaintiff." RSMF ¶¶ 82, 88-89.

    While covering for Laval, Maio received information suggesting that Laval may have been using his old office in Berry Gardens. The sources of that information were Defendant Malley and Joan Pollack, the Director of Development and Design and then-acting Director of Skilled Trades for the JCHA. Pollack Dep. at 25; Maio Dep. at 38-40, 71-74. In August 2009, Pollack learned from a JCHA electrician, Bob Zimmer, that there were active internet lines hooked up in Unit 104. JSUMF ¶ 90; Pollack Dep. at 23; Malley Dep., Def. Br. Exh. 12 (Docket No. 47-5) at 47. Pollack relayed this information to Defendants Malley and Maio. JSUMF ¶ 91; Maio Dep. at 38, 71-74; Pollack Dep. at 23-25; Def. Resp. to Interrogatories, Def. Br. Exh. 4 (Docket No. 47-5).

    Maio directed Malley and Pollack to check Unit 104 at Berry Gardens for outstanding files, paperwork or emails. Maio Dep. at 39-40, 59, 71-72, 74; Malley Dep. at 46, 48.[8] Defendants assert that Maio gave this direction in response to the information about internet lines in the unit and her discovery

---

[8] The record is unclear as to why there would be emails in Unit 104 distinct from those Maio accessed in Plaintiff's office at 400 U.S. Highway 1.

8

that Laval had failed to attend to JCHA business. JSUMF ¶ 92; Maio Dep. at 71. Because Pollack and Malley did not have keys for Unit 104, they asked Kohler to open the door. *Id.* ¶ 93-94; Kohler Dep. at 24-25; Malley Dep. at 46; Pollack Dep. at 35. Defendants did not contact Laval before entering unit 104. JSUMF ¶ 96. Neither Pollack and Malley expected Laval, who was on a leave of absence, to be present in the unit. *Id.* ¶ 95.

Whether Kohler entered the unit with Malley and Pollack is disputed. Defendants now assert that Kohler did not enter the unit, but waited at the front door. *Id.* ¶ 98; Kohler Dep. at 26-17. Laval cites testimony that Kohler entered the apartment and opened the door leading to the second room in the apartment. RSMF ¶ 98. *See* Pollack Dep. at 35 (stating the Kohler opened the inside door); Malley Dep. at 55 (stating that she did not recall whether the inside door was locked). Viewing the facts in the light most favorable to the Plaintiff, I will assume that Kohler did enter the unit and unlocked the inside door.

Malley, Pollack and Maio all testified that they found Unit 104 set up as an office, with a desk, filing cabinets, and book cases. *Id.* ¶ 101; Maio Dep at 61, 62-64, 76; Malley Dep. at 52; Pollack Dep. at 35, 37-39; Photographs, Def. Br. Exh. 18 (Docket No. 47-7).[9] In the unit they observed files and boxes of documents. JSUMF ¶ 101; Laval Dep at 76. Laval testified that the documents in the unit were in the filing cabinet, and on top of the bookshelves, desk and table. Laval Dep. at 76. The documents included both JCHA business and non-business matters. JSUMF ¶ 104; Malley Dep. at 55-56. Maio and Malley also found a laptop but did not open it because it did not appear to be a JCHA-issued computer. *Id.* ¶ 102. Pollack and Malley removed 25 folders and a box of keys from the unit. JSUMF ¶ 107. Maio testified that some of the documents found in the unit raised concerns as to potential violations of JCHA ethical and confidentiality policies. Maio Dep. at 77.

Laval maintains that Defendants' rationale for searching the apartment is not substantiated. RSMF ¶ 96. He asserts that the Defendants intended to terminate him even before the search was conducted. *Id.* ¶ 83.[10] He disputes

---

9  Maio was not with Malley and Pollack during their search of the unit. She testified, however, that she later went to the unit to see it for herself. Maio Dep. at 58-60.

10  The Defendants do not dispute that the JCHA was already investigating Laval's alleged misconduct and considering his termination. Malley testified that, prior to the search, they were "in the process of writing up charges" related to Laval's use of a

9

the evidence as to the internet hookup, contending that Kohler testified that the lines at issue were for another apartment, not Unit 104. RSMF ¶ 83.[11] He further asserts that the Defendants' search exceeded the scope of any legitimate concern about the internet lines. RSMF ¶ 90. Laval adds that Malley knew he had obtained counsel, and that counsel should have been contacted before the search. RSMF ¶ 94.

### 4. Plaintiff's Termination

On October 1, 2009, JCHA terminated Laval's employment based on violations of the Code. JSUMF ¶ 108; Termination Letter at 15-26. The Termination Letter recited JCHA's finding of ten violations of the Code, and stated the basis of the termination decision. *Id.* Regarding the search of the emails and the apartment, the letter advised him:

> During your extended absence, it was necessary for other JCHA staff to begin to handle some of the routine work involved with your position as Regional Asset Manager . . .
>
> Since email is routinely used at the JCHA, it was necessary for the JCHA staff person who was handling your work during your absence—Maria Maio, Executive Director—to read your emails to determine if there were any issues that needed to be addressed in a timely manner. (Please note that this was and is a routine process; the JCHA operates a "24/7" operation with many time sensitive issues; therefore emails of managerial staff are routinely reviewed by other staff who are "acting" for another employee). During the review of your email messages, numerous messages were found which led to the charges described below . . .

---

JCHA computer for personal and political purposes, and assigning personal and JCHA work to employees that did not directly work for him. Malley Dep. at 61-62.

[11] This somewhat mischaracterizes Kohler's testimony. Kohler testified that at some point *after* Defendants entered Unit 104, he was asked to find out why the computer lines to Unit 102 in 72 Danforth were not working because the building exterminator wanted to use Unit 102. Kohler Dep. at 41-43. Then, approximately six months after Defendants entered Unit 104, he was asked about the computer lines in Unit 104 by the new building director. *Id.* at 43-45. Kohler did not indicate he was asked about the computer lines in Unit 104 at any time prior to Defendants entering the Unit.

10

> It then came to the JCHA's attention that there were folders at an office which you had formerly used at Berry Gardens which the JCHA thought had been completely vacated. A quick examination of the folders was made to determine if there were any important and/or time sensitive documents are papers that needed attention. Among numerous work-related folders, were approximately nineteen (19) folders of documents, forms and other papers which were unrelated to JCHA work.

Termination letter at 15.

Laval was then advised by letter that any documents taken from the unit were available for him to pick up. JSUMF ¶ 108. Approximately six months after his termination, Unit 104 was assigned to another Director as office space. Kohler Dep. at 43-44.

Plaintiff brought this action on the basis of his termination and the search of Unit 104. Judge Wigenton dismissed all claims except Plaintiff's Fourth Amendment search and seizure claim. (Docket Nos. 17-18). Defendants now move for summary judgment on the Plaintiff's Fourth Amendment claim. (Docket Nos. 46-47).

## II.   DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248; *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### B. Fourth Amendment Search and Seizure

The Defendants have carried their burden of showing that no issue of material fact exists and that Plaintiff's Fourth Amendment claim under 42 U.S.C. § 1983 must be denied.

### A. Plaintiff's Reasonable Expectation of Privacy

Fourth Amendment rights are implicated only if the conduct of the JCHA officials at issue in this case infringed "an expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). To determine those privacy expectations that society is prepared to accept as reasonable, "the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous

protection from government invasion." *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984)) (citations omitted).

The reasonableness of any search thus depends on its context, *id.*—whether, for example, it involves the workplace or the home. The home, of course, enjoys the highest level, and the workplace a somewhat lower level, of protection. For Fourth Amendment purposes, the workplace is generally defined as comprising areas and items that are related to work and generally within the employer's control. *Id.* at 716. Such areas remain part of the employer-controlled workplace even if the employee places personal items in them. *Id.* That principle has its limits. Not everything that passes through a workplace setting thereby becomes part of the workplace; the contents of a closed suitcase brought to the office by an employee, for example, remain private. *Id.*

The Supreme Court has established two overlapping frameworks for analyzing Fourth Amendment claims against government employers. *See O'Connor v. Ortega*, 480 U.S. 709, 717, 725 (1987) (delineating Justice O'Connor's plurality approach and Justice Scalia's concurring approach); *City of Ontario v. Quon*, 560 U.S. 746, 756-57, 130 S.Ct. 2619 (2010). The plurality in *Ortega* held that for government employees, the question of whether the Fourth Amendment applies—*i.e.*, whether an employee has a reasonable expectation of privacy—must be assessed on a case-by-case basis. *Id.* at 718. O'Connor explained that public employees' expectation of privacy in their offices, desks, file cabinets and the like may be reduced by virtue of actual office practices and procedures, or by legitimate regulation. *Id.* at 717. Justice Scalia's concurrence took a different route to the same result. Justice Scalia stated categorically that the Fourth Amendment covered the government workplace. *Id.* at 731. He found, however, that many government office searches would survive Fourth Amendment scrutiny. In particular, he "would hold that government searches to retrieve work-related materials or to investigate violations of workplace rules—searches of the sort that are regarded as reasonable and normal in the private-employer context—do not violate the Fourth Amendment." *Id.* at 732.

Under either approach, however, employers are given "wide latitude" to enter their employee's offices for work-related, non-investigatory reasons, as well as for purposes of investigating work-related misconduct. *Id.* at 723-24,

13

732.[12] Justice O'Connor would grant or withhold Fourth Amendment protection based on a reasonableness standard, assessed case-by-case. *Id.* at 725-26. Justice Scalia would apply the Fourth Amendment across the board, but would generally find employer searches to retrieve work-related materials or to investigate violations of workplace rules to be reasonable. *Id.* at 731-32.

The answer to the question whether Laval had a reasonable expectation of privacy is not entirely clear. There is ample, strong evidence that Plaintiff was not authorized to use Unit 104 as either an office or residence. Nevertheless, we are at the summary judgment stage, and there do appear to be some genuinely disputed issues regarding the status of the unit.

Laval contends that he lived in the Unit, perhaps in an attempt to take advantage of the higher expectation of privacy in the home, or for other reasons. There is no substantial evidentiary support, however, for Laval's contention that the Unit was his residence. *See* discussion at pp. 4-7, *supra*. Plaintiff offers little but bare assertions, and claims not to recall a single relevant detail. All of the substantial evidence—personnel records, benefits forms, driver's license, personal resume, and prior deposition testimony—points the other way. Indeed, it appears that the JCHA *could* not, consistent with HUD regulations, have permitted Laval to live in Unit 104. JSUMF ¶ 44. In short, no reasonable fact finder could find that Laval resided there.

That circumstance, however, is not enough to dispel any argument that Laval had some reasonable expectation of privacy in the Unit. There is evidence that Laval used it as office space. The record is murky as to whether Defendants knew Laval was using the Unit or whether he was, officially or unofficially, permitted to do so. Giving the required latitude to Laval's version of the facts, I cannot find that he necessarily lacked any reasonable expectation of privacy in United 104.

---

[12] Neither approach requires a warrant or probable cause for the search to be legal. In general, a search of private property without consent is unreasonable unless it is accompanied by a warrant. *O'Connor*, 480 U.S. at 720 (citing *Mancusi v. DeForte*, 392 U.S. 364, 370, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528-529, 87 S.Ct. 1727 (1967)). However, in the workplace context, work-related searches do not require a warrant. *Ortega*, 480 U.S. at 722.

That, however, does not end the matter. Assuming that Laval had a reasonable expectation of privacy in his Unit 104 office, I nevertheless hold that the Defendants' search did not violate that reasonable expectation of privacy. I do not find a Fourth Amendment violation here under *Ortega*'s plurality or concurring approaches to workplace privacy. *See Quon*, 560 U.S. at 748-49 (assuming reasonable expectation of privacy and determining that search nevertheless did not violate Fourth Amendment).

First, the Defendants' search of Unit 104 meets the requirements of the O'Connor plurality approach: there is no substantial dispute that it was motivated by a legitimate, work-related purpose and was reasonable in scope. While Laval was on extended leave, Defendants discovered neglected or outstanding JCHA business, and received further information that Laval may have been using Unit 104 as an office, if only because there was an active internet connection to the unit. In response, Maio directed Malley and Pollack to enter the unit. JSUMF ¶ 92; Maio Dep. at 71. In doing so, the Defendants acted on a reasonable belief that the Unit was JCHA property that was serving as an office for Laval, who was on an extended leave. *See Quon*, 560 U.S. at 761 (finding that search was justified at its inception because there were "reasonable grounds for suspecting that the search [was] necessary for a noninvestigatory work-related purpose") (quoting *Ortega*, 480 U.S. at 726). There was ample reason to believe that documents pertinent to ongoing JCHA business would be found there, and there is no dispute that it was necessary for other workers to cover for Laval during his extended leave. There is no material conflict in the evidence that there was a legitimate, work-based motivation for the search. Laval does not directly dispute these bases for the search; rather, he simply states that it was a "smokescreen," without offering any significant evidence. RSMF ¶¶ 83, 89, 90. Laval does not advance, nor does the record contain, any evidence contradicting Defendants' proffered motivations for the search.

Some of Laval's assertions may be read to suggest that the search was actually motivated by the JCHA's belief that he was violating JCHA rules or committing other misconduct. *See* RSMF ¶¶ 81, 82. But that additional or alternative motivation would not render the search invalid. Under *O'Connor* and *Quon*, an employer may generally conduct a workplace search to investigate work-related employee misconduct. *See Quon*, 560 U.S. at 757. Here, after discovering JCHA business left outstanding by Laval, and discovering the active internet lines, the Defendants had a reasonable interest in both (1) making sure there was not more JCHA business left undone by

Laval, and (2) investigating Laval's use of the office for JCHA business, non-JCHA business, or both. If Defendants suspected that Plaintiff was using JCHA property to carry out personal, political, or other non-JCHA business, they would have had a legitimate basis to perform an investigatory search related to that potential misconduct. *See Quon*, 560 U.S. at 567. Defendants' search was, or became, relevant to the Defendants' investigation and subsequent termination of Laval. *See* Termination Letter at 1. But that is somewhat beside the point. This additional investigatory purpose, even if it existed at the time, would not be inconsistent with Defendants' motivation to ensure that all of Laval's JCHA business was completed while he was on leave.[13]

In light of those work-related purposes, the search was also reasonable in scope. The Defendants acted on a reasonable belief that the Unit was JCHA property that, under the most charitable view, was unofficially used by Laval as his work space. Upon entering the Unit, they saw that it was set up as an office. *See* JSUMF ¶¶ 86, 90, 95, 101. They then searched and collected documents, which appeared to consist of both JCHA and non-work-related materials. JSUMF ¶ 104, 107; Malley Dep. at 55-56. Malley and Pollack confined their search to the bookcases and filing cabinets, areas where business documents would naturally be found. Pollack Dep. at 39-41. They did not search or seize the laptop computer in the unit, because it did not appear to be JCHA property. *Id.* ¶ 102. Laval offers no evidence in opposition to these facts.

The intrusiveness of the search must also be measured against the limited extent of Laval's expectation of privacy. *Quon*, 560 U.S. at 762. Any such expectation was limited because, even in Laval's account, he had use of the unit as a JCHA employee, and he admits to doing JCHA business in the Unit. *See* Laval Dep. at 136-37. While on an extended leave of absence, he should have expected that his work space would be accessed by whatever JCHA employees were covering for him; business was not going to stand still. In light of these circumstances, the search was reasonable in scope and it

---

[13]     Laval's claim that he was living in the Unit, if substantiated, would not undermine, but only underscore JCHA's entitlement to investigate misconduct. JCHA's Code provides that JCHA property is to be used solely for JCHA business except on "limited occasions when, for the convenience of the JCHA, limited [nonbusiness] use can be permitted" or where prior approval and appropriate reimbursement procedures have been determined. Code at III.D. As I have said, however, there is no substantial evidence of residency.

comported with Fourth Amendment requirements. *Quon,* 560 U.S. at 763-64 (search does not have to be least intrusive possible to be reasonable).[14]

For the same reasons, the search also satisfies the more categorical test endorsed by Justice Scalia. The search was motivated by a legitimate, work-related interest in advancing JCHA business and/or investigating Laval's potential violations of JCHA rules. There are no circumstances suggesting a departure from the ordinary rule that such searches are permissible.

Accordingly, the search of Unit 104 by the Defendants was reasonable, and it did not violate the Fourth Amendment. Plaintiff has failed to present a triable factual issue as to his Fourth Amendment claim pursuant to 18 U.S.C. § 1983.

**Conclusion**

Because the search did not violate the Fourth Amendment, Plaintiff's claim pursuant to 18 U.S.C. § 1983 would fail as a matter of law. The Defendants have carried their burden of showing that no issue of material fact remains for trial. Summary judgment is thereby **GRANTED** in favor of the Defendants.

An Order will be entered in accordance with this Opinion.

---

[14] Superficially, this case bears some resemblance to the search analyzed in *Ortega,* but is distinguishable in important respects. In *Ortega,* the employee was a doctor whose employer suspected him of improper acquisition of a computer, sexual harassment, and other improprieties. While he took leave, the hospital (a public employer) searched his office, including his desk and filing cabinets. *Id.* at 718. The Court of Appeals found that the search violated the Fourth Amendment and that summary judgment for the doctor was appropriate. The Supreme Court reversed; in doing so, it found summary judgment inappropriate because the motivations for the search were in dispute, and the record was inadequate to assess its reasonableness. Five members of the Court agreed that the employee doctor had a reasonable expectation of privacy in the office. *Id.* Unlike here, however, the doctor had an undisputed and exclusive right to the office, which he had occupied for 17 years. *Id.* Seemingly all of the papers and objects in the office were personal in nature; hospital files were kept elsewhere. *Id.* Finally, there was no evidence that the hospital had established a policy discouraging or prohibiting employees from storing personal items in their offices. The hospital seemed to have no routine business reason to go into the office; for example, no other doctor needed access in order to cover for the plaintiff in his absence. Its stated justification—the need to inventory property of a departing employee—did not square with hospital policy. The doctor contended that it was a pure search for evidence of misconduct.

17

Dated: February 19, 2014

_____
Hon. Kevin McNulty
**United States District Judge**